JUSTICE TRIEWEILER
dissenting.
I dissent from the majority opinion. As a result of this decision, technical form is elevated over substance, while substantial justice is avoided, and the sellers’ credit rating continues to be jeopardized because of the buyer’s failure to comply with the terms of his contract.

NOTICE COMPLIANCE

The contract for sale of real estate, which was executed by the parties, provides in paragraph 12 that when the buyer fails to make payments due under the contract within 15 days of the due date, the sellers have the right to give the buyer notice that the payment must be made within 15 days from the date of notice. If notice is given and payments are not made within 15 days, the sellers have the right to accelerate all payments called for under the terms of the contract, and the balance of the principal, along with interest then due, must be paid within 15 days from the notice of acceleration. If the balance is not paid within the provided time, the sellers have the right to terminate the contract.
Paragraph 13, as noted by the majority, requires that notice be delivered in writing personally or sent by registered or certified mail to the buyer.
In this case, notice was delivered to the buyer at his place of residence by posting it on the door to his home. The notice was dated May 21,1993, and was delivered on May 25. In the notice, Cottle was notified that he was in default by failing to make the payments that were due on April 1 and May 1,1993. He was also notified that unless he corrected the default within 15 days, that the sellers had the right to accelerate the amounts due under the contract and declare the entire balance due. Cottle understood the substance of the notice, and eventually presented it to his attorney. However, his default was not cured within 15 days from the date on which the notice was delivered. He did not make the April and May payments until June 14, 1993.
*346 The majority makes much of the fact that Cottle may not have had actual notice 15 days before he actually cured his default. However, a reasonable inference from the facts which were proven is that Cottle did have notice more than 15 days before actual payment was made. The affidavit of the Ahrens’ process server established that the notice was posted on the door to Cottle’s home on May 25, a full 19 days before payment was made. Cottle offered no evidence to suggest that he did not observe the notice on the same day, or reasonably soon after it was posted. In fact, he admitted that he actually received the notice in May, which means that he had a minimum of 14 days’ notice before he made payment. The fact that Cottle suffered no actual prejudice from the manner in which notice was delivered is best illustrated by his own testimony, which was as follows:
Q. Okay. Can you tell me the circumstances of when you found a document at your house?
A. There was an envelope taped to my door.
Q. And would this have been in the springtime?
A. Was it May? Yeah.
Q. Did you open the envelope?
A. Yes.
Q. Okay. And do you remember what you found inside?
A. I believe there was a copy of a Notice of Default.
Q. Did you read the document?
A. Yes, I did.
Q. What did you do with the document?
A. Put it on my desk.
Q. Do you still have that document?
A. No, I do not.
Q. What happened to it?
A. I believe my attorney has it.
Q. So you gave him the document that you had?
A. Yes.
Q. So when you received the Notice of Default in May of 1993, you understood that you were in default under the terms of the contract?
A. Yes.
*347 Q. When you received this document that was posted to your door, the Deposition Exhibit 13, were you late in your payments?
A. I don’t remember.
Q. Given what we’ve just all gone through in this sheet, which explains your payment history, Deposition Exhibit 4, doesn’t that characterize that you were late in your payments?
A. Yes.
I would conclude that since Cottle had actual knowledge of his default, and had actual receipt of the notice of default sufficiently in advance of the date on which he was required to cure the default, that the notice and default terms of the parties’ contract were substantially complied with, and that to the extent there was any technical deviation from the specific language in the contract, that deviation was in no way material nor prejudicial to Cottle. This conclusion is consistent with our prior decisions in Christensen v. Hunt (1966), 147 Mont. 484, 414 P.2d 648, and LeClair v. Reiter (1988), 233 Mont. 332, 760 P.2d 740. While it is true, as pointed out in the majority opinion, that neither of these cases have precisely the same facts as this case, the principle involved is identical. In both cases, we held that a technical deviation from the default notice requirements in a contract cannot be asserted by the buyer as a defense to termination of the contract where his or her rights have not been prejudiced. That is exactly the situation here. While Cottle did not receive written notice by registered mail, he received written notice at the same location where the registered mail would have been delivered, and he received it well in advance of the date by which he was notified that his default must be cured. Therefore, he suffered absolutely no prejudice based on the manner in which the notice was delivered.
For these reasons, I would reverse the District Court’s conclusion that as a matter of law the Ahrens are unable to terminate their contract with Cottle because of their failure to comply with the notice provisions in their contract.

WAIVER

The principles of waiver, when correctly applied, are based on principles of fairness. However, the doctrine of waiver was never intended to reduce commercial transactions to some form of the game of “gotcha.” Yet, that is exactly the effect of the majority decision.
“ “Waiver is a voluntary and intentional relinquishment of a known right, or claim or privilege.’ ” Carpenters-Employers Trust Fund v. *348 Galleria Partnership (1989), 239 Mont. 250, 259, 780 P.2d 608, 613 (quoting Thiel v. Johnson (1985), 219 Mont. 271, 274, 711 P.2d 829, 831). Nothing that the Ahrens did even remotely resembled the intentional relinquishment of a known right.
Cottle’s late payments were not sent to, nor kept by, the Ahrens. They were sent to the Carteret Federal Savings Bank to satisfy the Ahrens’ monthly payment obligations. The Ahrens had no control over the fact that the payments were sent; they had no control over Carteret’s acceptance of the payments; they didn’t even know that the payments were made. They had no affirmative obligation under the principles of waiver to affirmatively notify Carteret that the payments would not be accepted. Furthermore, no such obligation should be imposed. The Ahrens were the obligors in the contract with Carteret. Their credit rating had already been severely damaged by Cottle’s frequent failure to make timely payments, and they should not have had to make payments for property they did not possess while they were attempting to recover it.
While the majority may assume, as it has in the past, that equity favors the avoidance of a forfeiture, the equities in this case are quite to the contrary. The hardship that this contractual relationship, and this Court’s decision, create for the Ahrens is best illustrated by the following portions of the affidavit of Brenda Ahrens submitted on August 1, 1994:
6. Mr. Cottle did not assume the Carteret Federal Savings Bank note. Since 1990, Mr. Cottle has been late in payments on 14 separate occasions. He has driven this note into foreclosure on three separate occasions.
7. I have no control over Carteret Federal Savings Bank. Carteret accepts payments without my approval or authorization. If the contract is not paid, they will automatically take the note into foreclosure proceedings.
8. Because my name is on the note, my credit has been completely destroyed by Mr. Cottle’s failure to timely make his payments.
11. In October, 1993,1 was advised that Mr. Cottle’s September, 1993, check bounced and was returned. The September, October, November, and December, 1993, payments were not made by Mr. Cottle and I was forced to pay ONE THOUSAND SEVEN HUN *349 DRED NINETY-ONE AND 56/100 DOLLARS ($1,791.56) in order to keep the property from foreclosure ....
12. My credit has been destroyed by Mr. Cottle’s failure to make timely payments and his repeated system of driving this matter into foreclosure.
For these reasons, I conclude that there was no waiver of Cottle’s default based on any reasonable definition of that term. I would reverse the order of the District Court which granted Cottle’s motion for summary judgment, and the District Court order which denied the Ahrens’ motion for summary judgment, and I would remand to the District Court for a determination of the attorney fees to which the Ahrens are entitled in this matter.